**Loy FRY and Oville Fry, as individuals and as co-partners d/b/a Cedarvale Tourist Courts, and Lawrence Taylor, Plaintiffs in Error,**

v.

**Gloria ALEXANDER, Defendant in Error.**

**No. 36245.**

Supreme Court of Oklahoma.

Nov. 22, 1955.

Stinson & Williams, Durant, for plaintiffs in error.

Goins & Smith, Ardmore, for defendant in error.

BLACKBIRD, Justice.

Defendant in error commenced this action, as plaintiff, against plaintiffs in error, as defendants, for damages for personal injuries consisting principally of a broken left ankle she suffered while patronizing a

roller skating rink at a resort known as "Cedarvale", between Davis and Ardmore, Oklahoma. The co-partners are the owners, and Lawrence Taylor, the other of the three defendants, is manager, of the skating rink. The parties will hereinafter be referred to as they appeared in the trial court, except when necessary for purposes of clarity, to refer to them by name.

After a jury trial, verdict was for the defendants and judgment was entered accordingly. Thereafter, the Court sustained plaintiff's motion for a new trial and it is from the judgment effectuating this ruling that defendants have lodged this appeal.

Their entire argument for reversal urges an affirmative answer to the question set out in their brief as follows: "Was it an abuse of discretion for the trial court to grant a new trial?" They say the trial was fairly conducted without reversible error; that the verdict and judgment in accord therewith were supported by ample evidence; and, that the trial court's subsequent judgment setting these aside and sustaining plaintiff's motion for a new trial was arbitrary and capricious, and constituted an abuse of discretion.

Plaintiff's counsel's argument to the trial court for sustaining her said motion, as described in their brief, was that the verdict was contrary to the preponderance of the evidence in that defendants had not effectively refuted and contradicted her evidence, and that said court had erred in giving the jury its Instruction No. 11, submitting to said body the issue of contributory negligence because there was not a "scintilla" of evidence as to any negligence on plaintiff's part. We cannot uphold either of these arguments.

Plaintiff's injuries occurred after she and her friend, Mrs. McFall, went to the skating rink, paid their admission, in return therefor received from the defendant manager, Mr. Taylor, a pair of shoe roller skates each, and had them on their feet skating on that part of the rink floor constructed for that purpose. Plaintiff's fall and resulting broken ankle occurred shortly after she skated onto the rink floor or skating course, to which she proceeded from the bench outside said course where her shoes had been taken off and the shoe skates put on her feet instead. The cause of her fall, as alleged in her petition, was that "a wheel or wheels or the truck of the left foot skate came loose * * *". She further alleged that it was defendants' duty "to use the highest degree of care" in the operation of the skating rink and that in disregard of this duty, they furnished her "a defective pair of skates * * *". Plaintiff and her witness, Mrs. McFall, testified the skates were laced on plaintiff's feet by Mr. Taylor, or some other employee of the rink, and on this point their testimony was in conflict with that of Taylor, who denied this. On the decisive issue in the case, i. e., whether or not the skates were defective, Taylor's testimony was positive and informed as compared with that of plaintiff and Mrs. McFall which was uncertain and equivocal. The skates were never identified nor introduced in evidence. Plaintiff's testimony as to how the accident occurred was that after she had skated onto the rink floor, and as she "started around, that is when something happened to the front of my skate, because it went down, the front of the skate went down, which caused me to break my ankle." When her attorney asked her if the front part or front truck of the skate fell off, she answered in the negative. When further questioned concerning what happened to the skate, plaintiff's testimony was as shown by the following excerpt from the record:

"Well, sir, mechanically I don't know exactly, but I do know that something went wrong with this part of the skate. That it came off, turned, broke or something that caused me to break my ankle. But definitely annd mechanically I couldn't tell you what happened to the skate, I did not see the skate after it was off, so I don't know.

"Q. But when you say the front part of your toe came down, you don't mean that this front part of the skate came clear off? A. No, sir, I don't know whether they came clear off or not."

Plaintiff's witness, Mrs. McFall, testified that on the occasion in controversy she had,

by herself, put on the skates she rented before plaintiff had hers on and was ready to skate; that she preceded plaintiff onto the rink floor or skating course, and had skated to one end of it and made the turn there and was about half way down the other side when she saw plaintiff step onto the course, take "one step" and "immediately" fall. She further testified:

"By the time I got to her, there were, oh, two or three people got there about the same time I did and immediately started to help her up, and first we didn't realize it was quite as serious as it was and so she told me that she had broken her ankle, she said, 'It is broken.' And so right then was the first time I realized that she was seriously hurt, and I looked down at her foot and the front rollers on her skates had turned.

"Q. Assuming this * * * (Indicating) might be a pair of the skating shoes * * * I have no way of knowing * * * can you show how you think that these wheels might have been, in whatever condition you thought they were in? A. Why instead of being in a position normal like that, like they are now, they just made a half circle and this roller was at the toe of the skate.

*    *    *    *    *    *

"A. Yes, the roller was up at the front of it, it was just loose, it was dangling on the skate, it wasn't off, it was just dangling on there.

*    *    *    *    *    *

"Q. Was it broken? A. Well, I don't know whether you would call it broken or not, it was loose and it turned around, and it would turn any way you would touch, * * *".

The rink manager, Mr. Taylor, testified that he saw plaintiff's fall and that it didn't occur until she had skated about 10 or 15 feet out on the rink floor. He further testified in substance that the trucks of the shoe skates rented at the rink were adjusted in three different degrees of looseness to suit the preferences of different kinds of skaters; that those with the so called "loose" adjustment were for the good skaters who usually preferred them because of their extra maneuverability or "lots of action" that such adjustment gives them; that the skates with the "medium" or "tight" adjustment were for the less expert skaters, who do not or cannot engage in the more daring and spectacular kinds of skating. He further testified in substance that the rink furnished its customers with wrenches with which to adjust the particular pair they rent, as the rink management does not know when they issue skates to a given customer what type of skater he is and does not undertake to find out. He further testified that all skates, before they are rented to anyone by the rink, undergo a routine inspection; that just previous to her putting them on, as well as after the accident, he had inspected the skates plaintiff wore at the time of the accident and there was nothing broken about them. He stated, however, that they could have been of the "loose truck" type and that a beginner using this type will usually fall. He testified further that when a truck is loose enough to be dangerous, it falls off.

■ From our examination of the evidence, it appears that the only facts essential to plaintiff's alleged cause of action positively thereby established, were that she fell with the skates on her feet and was injured by the fall. She testified that she was 27 years of age and had had experience in roller skating. Neither by the record nor by her counsel's presentation is it demonstrated that a shoe roller skate is an intricate mechanism or is a device of such character that its truck adjustment could and should not be observed and appreciated by any experienced skater exercising reasonably prudent care for his or her own safety. There is evidence tending to show she had a reasonable opportunity to do this, a factor which her counsel apparently overlooks. (Rather than making any thorough effort to demonstrate by the record the absence of any contributory negligence on her part, or that the verdict is against the preponderance of the evidence, her counsel, like that of defendant in error in Benedict Bros. Const. Co. v. Davoult, Okl., 266 P.2d 960, seem to assume their

client is entitled to a new trial because the trial judge ordered it and without regard to whether or not the jury's verdict was in accord with the evidence as a whole). We believe the jury, as the trier of the facts, had sufficient evidence before it, even assuming (as plaintiff's evidence tends to show) that some employee of the defendants assisted her in putting on the skates, to find that if the latter were guilty of any actionable negligence, plaintiff was also guilty of negligence which caused or contributed to the causing of her accident and injury. In this connection, see Bluett v. Eli Skating Club, 133 Conn. 99, 48 A.2d 557; Kelly v. Fox, 318 Ill.App. 481, 48 N.E.2d 592; Frye v. Omaha & C. B. Street R. Co., 106 Neb. 333, 183 N.W. 567, 22 A.L.R. 607, and other "skating rink" cases cited in the Annotations appearing at 16 A.L.R.2d 916 and 168 A.L.R. 896; 52 Am.Jur., "Theaters, Shows, Exhibitions, etc.", secs. 56 and 57; 86 C.J.S., Theaters & Shows, § 47 e and f.

We have examined not only the evidence but also the trial proceedings as a whole. We find no error either in the instructions or elsewhere in the record that can be held prejudicial to plaintiff or valid ground for setting aside the jury's verdict.

Then comes the ultimate question hereinbefore indicated. In such a case may a trial judge grant a new trial just because (as this judgment recites) he does not agree with the jury's verdict? We think a complete answer to this question is given in the recent opinion this Court promulgated in Hansen v. Cunningham, Okl., 285 P.2d 432, and the cases therein cited. Therein it is clearly demonstrated that to grant a new trial in such a situation is an abuse of the sound legal discretion vested in the trial judge and is in derogation of our system of jurisprudence in which the jury is the trier of the facts. The present case is clearly distinguishable from the cases plaintiff cites wherein the evidence was sufficient to support a judgment contrary to the verdict, or there was error in the trial proceedings sufficient to constitute ground for a new trial. As the present case is in neither category, we must hold that the judgment herein appealed from was an abuse of the trial court's proper discretion and therefore reversible error. Accordingly, it is hereby reversed.

WILLIAMS, V. C. J., and WELCH, CORN and HALLEY, JJ., concur.

JOHNSON, C. J., and DAVISON, JACKSON and HUNT, JJ., dissent.